UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIS MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:24 CV 1474 RWS |
| | ) | |
| FRANK BISIGNANO,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Willis Mason brings this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the Commissioner's decision denying his application for disability benefits under the Social Security Disability Insurance Program (SSDI), Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for benefits under the Supplemental Security Income Program (SSI), Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  For the reasons set forth below, I will affirm the decision of the Commissioner.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted for Leland Dudek as the defendant in this suit.

1

**Procedural History**

Plaintiff Willis Mason was born on July 21, 1960.  (Tr. 224.)  He is currently 65 years old.  He dropped out of high school in the 11th grade and has not earned a General Education Diploma (GED).[2]  (Tr. 87.)  Mason worked as a truck driver for approximately 30 years before he applied for disability benefits.  (Tr. 100-101.)  A Detailed Earnings Query from August 15, 2023 showed that Mason did not have any earnings in 2020, 2021, 2022, or in 2023 through the date of the report.  (Tr. 332-365.)  However, he did some 1099 work as a truck driver during this period.  (Tr. 99.)  His amended alleged onset date of disability is March 1, 2022, which is the last time he reported any truck driving.  (*Id.*)

On February 3, 2020, Mason protectively filed a Title II application for a period of disability and disability insurance benefits.  (Tr. 323-325.)  He also protectively filed a Title XVI application for supplemental security income on September 1, 2021.  (Tr. 140.)  He alleged his disability began on July 1, 2018. (*Id.*)  Mason's applications were initially denied on August 20, 2020.  (Tr. 126.) The applications were denied again upon reconsideration on February 9, 2021.  (Tr. 133.)  On February 19, 2021, Mason filed a request for a hearing before an Administrative Law Judge (ALJ).  The ALJ held a hearing via telephone on June 9,

---

[2] GED actually stands for General Education Development Test, however the initials have been used in the vernacular to mean a Graduate Equivalency Degree or a General Educational Diploma. https://ged.com/blog/what-is-a-ged/

2022.  (Tr. 49-93.)  Mason was not represented by counsel at the hearing.  An impartial vocational expert (VE) participated via telephone.

The ALJ issued a decision denying benefits on October 5, 2022.  (Tr. 137-149.)  On April 13, 2023, the Appeals Council vacated the ALJ's hearing decision and remanded the case to an ALJ.  (Tr. 156-157.)  A new hearing before an ALJ was held on August 23, 2023 via telephone.  Mason was represented by counsel at the hearing.  At the hearing, Mason amended his alleged onset date to March 1, 2022.  Pursuant to the Order of the Appeals Council, the ALJ was required to:

- Evaluate the new evidence from Washington University [Physicians Ophthalmology Clinic] and further consider the severity and effects of the claimant's visual impairment.
- Obtain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512 and 416.912).
- Further, if necessary, obtain evidence from a medical expert related to whether the claimant's visual impairment meets or equals the severity of an impairment listed in Appendix I, Subpart P, Regulations No. 4 (20 CFR 404.1513a(b)(2) and 416.913a(b)(2)).

(Tr. 156-157.)

At the hearing before the ALJ, Mason testified that he experiences continued and chronic pain and is not able to tolerate pain medication because of the medications that he takes for his blood pressure.  (Tr. 101-102.)  He testified that he had a series of motor vehicle accidents in 2021 and that he takes medication to

help him sleep because he has had trouble sleeping due to his pain.  (Tr. 102-103.)

He stated that he has arthritis in his left knee from when he used to play football,

and he has been monitored for having high blood pressure since he was 40 years

old.  (Tr. 103.)  He testified that his accidents resulted in a series of emergency

room visits, where he complained of wrist pain, low back pain, neck pain and

headaches.  (Tr. 104.)

Mason then testified about his visual impairments.  He testified that he has

no vision in his right eye.  (Tr. 108.)  He stated that he had cataracts removed from

his left eye and an implant put in and he only has vision in his left eye.  (*Id.*)

Mason stated that he has trouble seeing distance and thinks his vision issues

contributed to those accidents.  (Tr. 108-109.)  He testified that he drives locally to

places like the store, but it depends on the weather because the bright sun makes it

more difficult for him to drive and see the lines on the road.  (Tr. 109-110.)  He

testified that he wears prescription glasses that adjust to the sunlight during the day,

but that he cannot drive at night.  (Tr. 110.)

Additionally, Mason testified that he has trouble reading due to his vision.

(*Id.*)  When asked if he can read something if he holds it close, Hicks responded

that he can only make out some of it, but that is if he has bifocals on, and he stated

that sometimes he just cannot pick up words when reading, but he can see

numbers.  (*Id.*)  He further testified that if he is at the store and is not looking

4

straight down, he will walk over stuff or run into a lot of things, and he was told this was because of his glaucoma.  (Tr. 111.)  He does not use a cane to walk.  (*Id.*) Mason also stated that he sometimes has problems going up and down steps, especially with his knee.  (*Id.*)  He wears a brace on his knee to support him when he is walking up steps or doing something similar.  (Tr. 111-112.)

When questioned by his attorney, Mason testified that he used to help mow grass and do weeding, but he does not do that anymore.  (Tr. 113.)  He testified that he can only stand up for an hour before needing to sit down. (Tr. 114.)  He also testified that he still has problems with his left wrist and that he is left-handed, but he stated that it does not impact his ability to drive.  (Tr. 115)

On September 13, 2023, the ALJ issued a decision finding that Mason was not disabled and that he could perform  a reduced range of medium-duty, unskilled occupations.  (Tr. 41.)  On May 23, 2024, the Appeals Council denied Mason's request for review.  (Tr. 13.)  The ALJ's decision is now the final decision of the Commissioner.  42 U.S.C. §§ 405(g).

In this action for judicial review, Mason contends that the ALJ failed to resolve a conflict between Mason's RFC and the VE's testimony.  Mason asserts that he cannot perform the jobs identified by the VE because the ALJ's RFC determination limits him to no reading of fine print (ECF # 17 at 4-9).  Mason also contends that the ALJ failed to develop the record fully and fairly.  He argues that

5

the ALJ should have obtained medical opinion evidence to translate Mason's visual impairments into functional abilities (*Id.* at 9-14).  Mason now requests that I reverse the Commissioner's decision and remand for further evaluation.  (*Id.* at 12.)  For the reasons that follow, I will deny Mason's request.

**Medical Records and Other Evidence Before the ALJ**

With respect to the medical records and other evidence of record, I have considered Mason's Statement of Uncontroverted Material Facts (ECF # 18) and the Commissioner's Response to Plaintiff's Statement of Uncontroverted Material Facts (ECF # 21-1).  Additional facts will be discussed as needed to address the parties' arguments.

**Discussion**

*A.  Legal Standard*

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only

if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity (SGA).[3]  If not, the disability analysis proceeds to the second step.  In this step the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled and the analysis ends.  If the claimant has a severe impairment, the Commissioner then proceeds to the third step and determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is

---

[3] "Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  'Substantial work activity' is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  'Gainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience."  (Tr. 29.)

conclusively disabled.  If the impairment is not equivalent to a listed impairment, then the Commissioner proceeds to the fourth step to determine whether the claimant can perform her past relevant work.[4]  If so, the claimant is not disabled. If not, at the last step the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  "[Substantial evidence] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision.  *McNamara v. Astrue*, 590

---

[4] "The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965)."  (Tr. 30.)

F.3d 607, 610 (8th Cir. 2010).  If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).  I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome.  *McNamara*, 590 F.3d at 610.

When evaluating medical opinions and prior administrative medical findings, the ALJ will consider various factors, the "most important factors" being supportability and consistency.  20 CFR § 404.1520c(a).  The ALJ must "articulate in his determination or decision how persuasive he find[s] all of the medical opinions and all of the prior administrative medical findings in your case record."  *Id.* at § 404.1520c(b).

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

[The] claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Id.* at 1322.[5]  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding.  *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

### B.  ALJ's Decision

In his written decision, the ALJ found that Mason had not engaged in substantial gainful activity since March 1, 2022, the amended alleged onset date of his disability.  (Tr. 30.)  The ALJ found that Mason had the following severe impairments: cataracts and low vision, degenerative disc disease of the cervical spine, and obesity.  (Tr. 31.)  The ALJ determined that Mason's impairments or combination of impairments did not meet or medically equal the severity of one of

---

[5] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character. However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record." *See* SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *Lawrence v. Saul*, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found Mason to have the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R § 404.1567(c) with the following limitations:

> [he can] occasionally lift and carry 50 pounds and he can frequently lift and carry 25 pounds. The claimant should avoid standing and walking on uneven surfaces. He should never climb ladders, ropes, and scaffolds, and he can occasionally climb ramps and stairs. The claimant should avoid commercial driving, avoid bright light situations such as sunlight and low night situations, and avoid hazards such as unprotected heights and dangerous moving machinery. He cannot read fine print.

(Tr. 34-35.)  The ALJ determined that Mason is unable to perform any past relevant work.  (Tr. 40.)  The ALJ consulted a VE to assess whether jobs within Mason's RFC existed in significant numbers in the national economy.  (Tr. 40-41.)  The VE identified the jobs of laundry worker,[6] DOT 361.687-018, (210,000 positions); building cleaner,[7] DOT 381.687-018, (1,000,000 positions); material handler,[8] DOT 922.687-058, (700,000 positions).  (Tr. 41.)

### C.  Mason's Objections to the ALJ's Decision

Mason contends that the ALJ erred in relying on the VE's testimony without "resolving the apparent conflicts between the testimony and the Dictionary of

---

[6] The DOT refers to the job as "Laundry Laborer."  (Tr. 41.)

[7] The ALJ's decision mistakenly states that the VE recommended the job of building cleaner, DOT 381.6876-*010* (Central-Supply Worker).  (Tr. 41.)  However, the transcript from the hearing shows that the VE recommended the job of building cleaner, DOT 381.687-*018* (Cleaner, Industrial (any industry)).  (Tr. 119.)  The job of "Cleaner, Industrial" requires medium exertion and SVP 2, indicating that it is unskilled.  *See* U.S. Dep't of Lab., *Dictionary of Occupational Titles* 282 (rev. 4th ed. 1991), available at https://hdl.handle.net/2027/umn.31951d00357017o.

[8] The DOT refers to the job as "Laborer, Stores." (Tr. 41.)

Occupational Titles (DOT)" (ECF # 17 at 4).  He argues that VE's testimony was inconsistent with the DOT because Mason cannot read fine print, and the three representative occupations provided by the VE require "near acuity."  As a result, he argues that the ALJ failed to conduct the proper analysis at Step 5 of the evaluation process because he "made no effort to identify and resolve this conflict, in violation of SSR 00-4p" (*Id.*).

Additionally, Mason contends that the ALJ failed to develop the record fully and fairly because he did not obtain a medical opinion "to translate the medical evidence into a supportable RFC assessment" (*Id.* at 9).  Specifically, Mason argues the ALJ should have obtained medical opinion evidence to translate the evidence of Mason's visual impairments into functional abilities to support his RFC.  He asserts that there is no medical opinion evidence to support the ALJ's finding that Mason can perform medium work with the severe impairments of cataracts and low vision, degenerative disc disease of the cervical spine, and obesity (*Id.* at 10).

### *The VE's testimony supported the ALJ's finding that Mason can perform other work available in significant numbers in the national economy.*

At Mason's hearing, the VE testified that an individual with Mason's RFC would not be able to perform the past work that Mason performed as a truck driver. (Tr. 119.)  However, the VE testified that there was other work in the national

12

economy that such an individual could perform.  (*Id.*)  The VE stated that the hypothetical person would have to "work indoors" and provided the examples of laundry worker, building cleaner, and material handler as occupations available in significant numbers in the national economy that a hypothetical person with Mason's limitations could perform. (*Id.*)  The VE affirmed that her testimony was consistent with the information provided in the DOT.  (*Id.*)  In his decision, the ALJ found that the VE's testimony was consistent with the information contained in the DOT pursuant to SSR 00-4p.  (Tr. 41.)

Under SSR 00-4p, the ALJ has an "affirmative responsibility to ask about any possible conflict between the VE or [vocational specialist (VS)] evidence and information provided in the DOT."[9]  If there appears to be a conflict, the ALJ must ask the VE or VS if the "evidence he or she has provided conflicts with information provided in the DOT," and the ALJ must "obtain a reasonable explanation for the apparent conflict."[10]  Mason argues that the ALJ failed to inquire about a conflict between the VE's testimony and the DOT.  He asserts that the VE failed to cite any job that can be performed without reading find print, which was inconsistent with Mason's RFC that he cannot read fine print (ECF # 17 at 6).  Citing the *Selected Characteristics of Occupations Defined in the Revised*

---

[9] *Pol'y Interpretation Ruling : Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000).
[10] Id.

*Dictionary of Occupational Titles* (SCO),[11] Mason notes that the jobs of laundry worker, building cleaner, and material handler require either occasional or frequent "near acuity." The SCO defines "near acuity" as "clarity of vision at 20 inches or less."[12] Mason also cites the definition of "near acuity" used by the Department of Labor for its Occupational Requirements Survey, which is "clarity of vision at approximately 20 inches or less (i.e., working with small objects or reading small print), including use of computers."[13]

According to Mason, he cannot perform any of the occupations listed by the VE because his RFC is limited to no reading of fine print, and the definition of "near acuity" includes the ability to read small print (ECF #17 at 4). The Commissioner concedes that the jobs of laundry worker, building cleaner, and material handler require either occasional or frequent near acuity (ECF # 21 at 5). The Commissioner argues, however, that the RFC limitation of no reading of fine print does not necessarily prevent Mason from performing *all jobs that require near acuity* (*Id.* at 4-6) (emphasis added). The Commissioner asserts that Mason draws a flawed and unsupported "equivalence" between his inability to read fine

---

[11] "The companion publication to the DOT, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), is relied on by Administration arbiters and the Courts to determine what each occupation requires." *Ausburn v. Kijakazi*, No. 4:21-CV-1145-BRW-JTR, 2022 WL 16550320, at *3 n.6 (E.D. Ark. Oct. 31, 2022).

[12] U.S. Dep't of Lab., *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* C-4 (1993), available at https://hdl.handle.net/2027/umn.31951d00286799y.

[13] U.S. Dep't of Lab., Bureau of Lab. Stat., *Occupational Requirements Survey: Physical Demands*, https://www.bls.gov/ors/factsheet/physical-072015.htm#listo (last visited Feb. 26, 2026).

print and being unable to work in any job that requires near acuity (*Id.* at 6).  The Commissioner maintains that by doing so, Mason creates a conflict between the VE's testimony and the DOT that did not otherwise exist.

Here, I find that Mason fails to demonstrate that there was an unresolved conflict between the VE's testimony and the DOT.  Mason cites to no authority which holds that an RFC limited to no reading of fine print would prevent an individual from performing any work that requires near acuity.  Courts that have addressed this issue have distinguished between the inability to read fine print and near acuity.  *See Ausburn v. Kijakazi*, No. 4:21-CV-1145-BRW-JTR, 2022 WL 16550320, at *3 n.6 (E.D. Ark. Oct. 31, 2022) (finding that "Near Acuity does not appear to conflict with the RFC for reading ordinary or book print, but no fine print"); *see also May v. Colvin*, No. 12-1026-CV-W-REL-SSA, 2013 WL 1702544, at *13 (W.D. Mo. Apr. 19, 2013) (noting that a job requiring "some reading" did not necessarily conflict with the claimant's RFC because "the ALJ did not preclude all reading but only reading of 'fine print'").

In support of his argument, Mason provides the following excerpt from the DOT's description of the job of Laundry Laborer, DOT 361.687-018:

> records weights on tickets, fastens identification pins or clips onto laundry to facilitate subsequent assembly of customers' orders and sorts net bags containing clean wash according to customers' identification tags, among other tasks.[14]

---

[14] ECF # 17 at 6; *See* U.S. Dep't of Lab., *Dictionary of Occupational Titles*, at 261.

At Mason's hearing, he testified that if he is wearing bifocals, he can read numbers, and that he can only see up close.  (Tr. 110.)  He further testified that sometimes he needs to use a magnifying glass to read up close. (*Id.*)  Based on the record and Mason's testimony, there is no indication that Mason's visual impairments would prevent him from recording weights on tickets, fastening identification pins or clips onto laundry, and sorting net bags according to customers' identification tags. Even if these tasks require near acuity, Mason has not shown that he would be required to read fine print, as opposed to small print, numbers, or even large print. Moreover, the SCO lists the job of Laundry Laborer as one which *occasionally* requires near acuity.  The SCO utilizes the term "occasionally" to denote when an "activity or condition exists up to 1/3 of the time."[15]  The DOT notes that the job of Laundry Laborer could include any combination of the following duties:

> Opens bundles of soiled laundry. Places bundles onto conveyor belt or drops down chute for distribution to marking and classification sections. Weights laundry on scales and records weight on tickets. Removes bundles from conveyor and distributes to workers using handtruck. Fastens identification pins or clips onto laundry to facilitate subsequent assembly of customers' orders. Sorts net bags containing clean wash according to customers' identification tags. Sorts empty net bags according to color and size. Collects identification tags from lots of laundered articles for reuse. Moistens clean wash preparatory to ironing. Operates power hoist to load and unload washing machines and extractors. Stacks linen supplies on storage room shelves. Unloads soiled linen from trucks.[16]

---

[15] U.S. Dep't Lab., *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, at 313.
[16] U.S. Dep't of Lab., *Dictionary of Occupational Titles*, at 261.

16

Based on this description, it appears that very few duties would require Mason to read any print at all, much less fine print.  Nor does there appear to be a restriction on reading up close or wearing bifocals while performing the job.  I therefore find that there was no conflict between the VE's testimony and the DOT regarding the Laundry Laborer job, and the ALJ did not err by not attempting to resolve the alleged conflict.

Similarly, Mason does not identify the particular duties of the building cleaner job that require the ability to read fine print.  Mason concludes that "[he] cannot perform this job when he cannot read fine print" because it requires occasional near acuity (ECF # 17 at 7).  According to the DOT, the job of Cleaner, Industrial,[17] DOT 381.687-018, involves any combination of the following duties:

> Transports raw materials and semifinished products or supplies between departments or buildings to supply machine tenders or operators with materials for processing, using handtruck. Arranges boxes, material, and handtrucks or other industrial equipment in neat and orderly manner. Cleans lint, dust, oil, and grease from machines, overhead pipes, and conveyors, using brushes, airhoses, or steam cleaner. Cleans screens and filters. Scrubs processing tanks and vats. Cleans floors, using water hose, and applies floor drier. Picks up reusable scrap for salvage and stores in containers. Performs other duties as described under CLEANER (any industry) I Master Title. May burn waste and clean incinerator. May pick up refuse from plant grounds and maintain area by cutting grass or shoveling snow. May operate industrial truck to transport materials within plant. May start pumps to force

---

[17] Although Mason argues that he cannot perform the central-supply worker job or the building cleaner job, I will only consider the building cleaner job for the purposes of this Order. Based on the transcript of the oral hearing, the VE did not identify the central-supply worker job as one Mason could perform, and the ALJ mistakenly cited it in his decision.

cleaning solution through production machinery, piping, or vats. May start pumps to lubricate machines.[18]

As with the laundry worker job, the duties of the building cleaner job do not appear to involve reading fine print. Mason has failed to identify which of these duties he would be unable to perform because of his inability to read fine print. I find that the VE's testimony that Mason could perform the building cleaner job did not conflict with the DOT.

Mason further argues that the job of Laborer, Stores, DOT 922.687-058, may require the use of computers, reading production schedules, and completing acquisition forms, and the SCO lists it as a job requiring frequent near acuity.[19] But, as already explained, Mason has failed to show that his RFC limitation of no reading of fine print precludes all activities that require near acuity. Even so, "if even one job mentioned by the vocational expert supports the ALJ's finding, that is sufficient to sustain the ALJ's decision." *Williams v. Berryhill*, No. 4: 16 CV 794 DDN, 2017 WL 2062269, at *7 (E.D. Mo. May 15, 2017) (citing *Weiler v. Apfel*, 179 F.3d 1107, 1110–11 (8th Cir. 1999)) ("We need not exhaustively compare [claimant's] residual functional capacity to every job recommended by the vocational expert."). Even if I assume that the material handler job requires reading fine print, Mason could still perform the laundry worker job or the building

---

[18] U.S. Dep't of Lab., *Dictionary of Occupational Titles*, at 282.
[19] ECF # 17 at 8; *See* U.S. Dep't of Lab., *Dictionary of Occupational Titles*, at 947.

cleaner job, both of which are available in significant numbers in the national economy.  (*See* Tr. 119.)

For these reasons, I find that the VE's testimony supported the ALJ's finding that Mason can perform other work available in significant numbers in the national economy, and the ALJ did not err by not asking about the alleged conflicts.

### *The ALJ fully and fairly developed the record.*

Next, Mason asserts that the ALJ failed to develop the record fully and fairly.  Mason asserts that there was no medical opinion evidence in the record to translate Mason's visual impairments into functional abilities (ECF # 17 at 9).  He further argues that there was no medical opinion evidence in the record to support the ALJ's finding that Mason can perform medium work with the severe impairments of cataracts and low vision, degenerative disc disease of the cervical spine, and obesity (*Id.* at 10).  He claims that the ALJ should have obtained specific medical opinion evidence about Mason's functional capabilities.

Contrary to Mason's assertion, the ALJ was not required to obtain specific medical opinion evidence translating his medical records into functional capabilities.  *See, e.g., Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) ("[T]here is no requirement that an RFC finding be supported by a specific medical opinion.").  The ALJ's RFC assessment must be supported by only "some evidence of the claimant's ability to function in the workplace."  *Id.* (citation omitted).  "In

19

the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Id.* (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).  Pursuant to the April 13th, 2023, Order of the Appeals Council, the ALJ on remand evaluated the new evidence from Washington University Physicians Ophthalmology Clinic and considered other evidence developed after the ALJ's prior decision, including records from Betty Jean Kerr People's Health Center in November and December 2022 and St. Mary's Hospital on July 24, 2023.  (Tr. 28) (citing Tr. 804-846, 847-863, 864-869.)  The Appeals Council ordered the ALJ to obtain additional evidence from a medical expert related to whether Mason's visual impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404 only *if necessary*.  (Tr. 28, 157.)

On August 2, 2023, Mason sent a letter requesting that an ophthalmologist be present at his hearing before the ALJ.  (Tr. 440.)  The ALJ declined the request because "the evidence from Washington University Physicians, Ophthalmology Clinic, with an [*sic.*] record regarding the claimant's left eye surgery in November 2021 (Ex. 8F/100-102) and the entries from May 16, 2023 (Ex. 10F/1) to June 29, 2023 (Ex. 10F/16-17), provided sufficient recent evidence regarding the claimant's eyesight."  (Tr. 28.)  It is undisputed that the ALJ considered the medical evidence from Mason's visits to the Washington University Physicians Ophthalmology

20

Clinic from November 2021 through June 2023.  (See Tr. 847-863.)  Although Mason concedes that the ALJ had sufficient information to determine that Mason's visual impairments do not meet Listing 2.02,[20] he argues that "input from an expert in ophthalmology" was required to determine if Listings 2.03 or 2.04 were met (ECF #17 at 12).

Here, I find that the record was adequately developed regarding Mason's visual impairments.  After considering the new evidence in the record pertaining to Mason's visual impairments, the ALJ determined that additional evidence from a medical expert and a consultative examination were unnecessary.  (Tr. 28.)  "Under the regulations, if the medical evidence available to the ALJ is insufficient to enable a determination of whether claimant is disabled, a consultative examination *may* be ordered."  *Lacy v. Astrue*, No. 4:12-CV-16 CEJ, 2012 WL 6738495, at *7 (E.D. Mo. Dec. 31, 2012) (citing 20 C.F.R. § 416.917) (emphasis added).  "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."  *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994).  (Tr. 28.)  The ALJ found that Mason's visual impairments do not meet or equal the severity of an impairment listed in 20 C.F.R Part 404 because "[Mason's]

---

[20] Listing 2.02 requires "loss of visual acuity with remaining vision in the better eye after best correction of 20/200 or less."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.02.

uncorrected visual acuity in his better eye is 20/100, and he drives a motor vehicle." (*Id.*) To the extent Mason argues that he "cannot make a coherent argument that he meets or equals Listings 2.03[21] or 2.04[22] because he, much like the ALJ, cannot translate ophthalmology treatment notes," Mason has failed to meet his burden of proof. *See Schmitt v. Kijakazi*, 27 F.4th 1353, 1358-59 (8th Cir. 2022) ("The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing.").

On November 16, 2021, Mason visited Washington University Physicians Ophthalmology Clinic with diagnoses of primary open angle glaucoma in his left eye (severe) and visually significant nuclear sclerotic cataract of the left eye. (Tr. 801.) He reported having blurred vision causing difficulty with the daily activities of living. (*Id.*) Dr. Arsham Sheybani, MD, performed a phacoemulsification with intraocular lens implant and *ab interno* goniotomy on his left eye. (*Id.*) Dr. Sheybani performed the goniotomy to "help reduce intraocular pressure (IOP)." (*Id.*) During the cataract portion of the surgery, the cataract in Mason's left eye was removed and an implant was placed. (Tr. 107, 802.) Mason left the procedure

---

[21] Listing 2.03 requires contraction of the visual fields in the better eye with the widest diameter subtending am angle around the point of fixation no greater than 20 degrees; a mean deviation or defect (MD) of 22 decibels or grater, determined by automated static threshold perimetry that measures the central 30 degrees of the visual field; or a visual field efficiency of 20 percent or less, determined by kinetic perimetry. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.03.
[22] Listing 2.04 requires loss of visual efficiency, or visual impairment, in the better eye: a visual efficiency percentage of 20 or less after best correction; or a visual impairment value of 1.00 or greater after best correction. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.04.

in stable condition and "tolerated the procedure well." (Tr. 802.) On November 22, 2021, Mason informed the clinic that since the surgery, his vision had been somewhat blurry but was noticeably improving with time. (Tr. 772.)

On March 14, 2022, Mason was examined by Dr. Charles Maxwell Medert, MD, at the ophthalmology clinic. (Tr. 796.) Mason presented with primary open angle glaucoma in both eyes (severe stage). (*Id.*) Dr. Medert noted that Mason could see hand movement at six inches, Mason's IOP was "excellent," and that the exam was "reassuring." (Tr. 798.) Mason's vision in his left eye was 20/90, and the IOP in his left eye had dropped from 42 (very high) during his previous visit to 9 and 9. (Tr. 798, 34.) The IOP in his right eye was 11 and 12. (Tr. 792.) His slit lamp and fundus external exam was normal. (Tr. 792-793.) Mason was instructed to use brimonidine (Alphagan) 0.2 percent ophthalmic solution one drop twice a day in both eyes, cosopt one drop twice a day in both eyes, and latanoprost one drop at bedtime in his right eye. (Tr. 794.) He was instructed to return for a follow-up in three months. (Tr. 797.)

Mason's next visit to the clinic was not until May 16, 2023 because he allegedly lost and then regained his health insurance. (Tr. 34.) Mason reported cloudy vision in his left eye and that he had limited distance vision in that eye. He stated that it was difficult for him to drive and night and that he did not like to drive at night because of the glare and/or rain. (Tr. 848.) He reported having

23

floaters, but no flashes of light and the sensation of a foreign body in his eye (FBS) with burning.  (*Id.*)  Mason stated that because he lost his health insurance, he had only been using the cosopt and the latanoprost drops, but not the brimonidine.  (*Id.*)  Dr. Daniel Joseph Watson, MD, examined Mason and found denser inferior field loss and new superior loss in Mason's left eye.  (Tr. 851.)  In both of Mason's eyes, the temporal thickness, superior thickness, nasal thickness, and inferior thickness were showing abnormal thinning.  (Tr. 852.)  Mason was instructed to restart the brimonidine drops twice a day, and Dr. Watson discussed with him that glaucoma is a vision threatening disease and he must use his eye drops and keep his follow-up appointments to prevent further vision loss.  (Tr. 854.)

On June 19, 2023, only two months before his August 2023 hearing, Mason again visited the clinic.  He was examined by Dr. Ariana Mireille Levin, MD.  Dr. Levin noted that Mason had restarted the brimonidine and latanoprost eyedrops and his "IOP improved on 4 classes."  (Tr. 860.) But he also had "very thin OCT RNFL (optical coherence tomography of the retinal nerve fiber layer). (Tr. 34, 860.)  Mason stated that he was interested in surgery to try to optimize vision in his right eye.  Dr. Levin explained that the surgery might not improve his vision at all, but the goal would be to brighten and optimize the vision.  (Tr. 860.)

On June 23, 2022, Mason visited the emergency department at St. Mary's Hospital and complained of having a rash on his right arm, chest, and neck.  (Tr.

24

866.)  He reported that he was cutting grass and weeds a few days prior and believed he was exposed to poison ivy.  (*Id.*)  At his hearing before the ALJ, Mason testified that he was still driving and was wearing prescription sunglasses that automatically adjust to the sun when he comes in and out of the light.  (Tr. 110.) He also testified that he was being set up for cataract surgery for his right eye.  (Tr. 107.)

Overall, I find that the record was sufficiently developed for the ALJ to make an informed decision about whether Mason's visual impairments met the severity of one of the listings under 20 C.F.R. Part 404, Subpart P, Appendix 1. Mason failed to demonstrate that his visual impairments meet *all* of the listing's specified criteria.  "To meet a listing, an impairment must meet all of the listing's specified criteria."  *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citation omitted).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  The ALJ properly considered the new medical evidence in the record and Mason's reports of his daily activities, including driving and cutting the grass. Nothing more was required of the ALJ at this step of the evaluation process.[23]

---

[23] *See* Soc. Sec. Ruling (Ssr) 17-2p: Titles II & Xvi: Evidence Needed by Adjudicators at the Hearings & Appeals Council Levels of the Admin. Rev. Process to Make Findings About Med. Equivalence, SSR 17-2P (S.S.A. Mar. 27, 2017) ("If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment.").

25

Additionally, Mason contends that the record was not fairly and fully developed regarding his physical impairments. Upon careful review of the complete record, I find that it was sufficiently developed for the ALJ to formulate Mason's RFC.

On September 20, 2021, Mason visited Greater Missouri Imaging and received an MRI of the cervical spine without contrast. (Tr. 505.) Dr. Matthew Ruyle noted that Mason's cervical alignment was straightened, there was no spondylolisthesis, and his marrow was normal at all levels. However, the MRI showed C2-C3 left sided facet arthropathy resulting in mild left foraminal stenosis. (*Id.*) There was no central canal or right foraminal stenosis observed. (*Id.*) C4-C5 demonstrated a midline annular tear/fissure, but there was no definite central canal stenosis. C5-C6 demonstrated severe right greater than left foraminal stenosis and mild central canal stenosis. (*Id.*) C6-C7 demonstrated a mild degree of central canal stenosis and mild bilateral foraminal stenosis, and C7-T1 showed normal structure and signal characteristics. (Tr. 506.) An MRI of Mason's wrist without contrast was performed on the same day. Dr. Ruyle noted that the proximal and distal carpal rows were in anatomic alignment and no carpal fracture was observed, and the intrinsic ligaments of the wrist were intact and unremarkable. (Tr. 507.)

On November 14, 2022, Mason visited the Betty Jean Kerr People's Health Center for a routine follow-up appointment. (Tr. 816.) A physical examination

26

was performed, and Mason's neck exam was normal with normal palpation and a normal thyroid gland, and he did not have any cervical supraclavicular adenopathy. (Tr. 820.)  He had no edema, his cardiovascular assessment was normal, with a regular heart rate and rhythm and no murmurs, gallops or rubs, and his respiratory inspection was normal.  (*Id.*)  On July 24, 2023, Mason had a colonoscopy performed at St. Mary's Hospital in St. Louis.  Dr. Giao Vuong, MD, performed a pre-procedure exam on Mason.  (Tr. 900.)  Mason's neck was supple and posterior pharynx was clear, his lungs were clear, his heart sounds were normal with no murmurs, his abdomen was soft with no tenderness, masses or organomegaly, and his extremities were normal.  (Tr. 901.)

Based on medical evidence and Mason's subjective testimony regarding his physical impairments, the ALJ formulated his RFC with additional limitations. The ALJ's RFC determination states that because of his degenerative disc disease, obesity, and non-severe knee pain, he should "avoid standing and walking on uneven surfaces…should never climb ladders, ropes, and scaffolds, and he can occasionally climb ladders and stairs."  (Tr. 40.)  I find the ALJ fully and fairly developed the record in order to make this determination.

Because I find that the VE's testimony supported the ALJ's finding that Mason could perform other work available in significant numbers in the national

27

economy and that the ALJ fully and fairly developed the record, I will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security is affirmed.

A separate Judgment is entered herewith.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 25th day of March, 2026.